UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IMAGENETIX, INC., on behalf of itself and all others similarly situated,<br><br>    Plaintiff,<br>    v.<br><br>WALGREEN CO.,<br><br>    Defendant. | Civil Action No. 11-cv-8277<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

1. This case involves a scheme by Defendant Walgreen Co. ("Walgreens") to defraud manufacturers who have promoted their products in Walgreens' stores through Register Rewards coupons, Easy Saver rebates, or other promotional programs. Plaintiff Imagenetix, Inc. ("Imagenetix") and other manufacturers reimburse Walgreens for credits or payments Walgreens extends to consumers who redeem coupons or rebates issued when the consumers purchase products subject to a promotional program. Rather than only seeking reimbursement from manufacturers for credits or payments legitimately given to consumers for valid coupons or rebates redeemed, Walgreens also uses its promotional programs to defraud manufacturers: it seeks reimbursement from manufacturers for credits or payments that Walgreens never extends to consumers. For example, Walgreens has fraudulently printed Register Rewards coupons unrelated to a consumer purchase, claimed that the coupons were issued to and redeemed by consumers, and sought repayment from manufacturers for the coupon value Walgreens purported to extend to consumers. Imagenetix seeks damages for itself and a class of manufacturers harmed by Walgreens' scheme.

1

## *The Parties*

2.     Plaintiff Imagenetix, Inc. ("Imagenetix") is a Nevada corporation with its principal place of business in San Diego, California. Imagenetix develops, formulates and markets over-the-counter, natural-based nutritional supplements and skin care products. Imagenetix's primary product during the time period at issue was Celadrin, which promotes healthy joints. Imagenetix's gross annual revenue is approximately $7 million.

3.     Defendant Walgreen Co., doing business as Walgreens ("Walgreens") is an Illinois corporation with its principal place of business in Deerfield, Illinois. Walgreens is the largest drugstore chain in the country, operating over 8,000 locations across all 50 states. Walgreens' gross annual revenue is approximately $72 billion.

## *Jurisdiction, Venue and Interstate Commerce*

4.     The Court has subject matter jurisdiction pursuant 28 U.S.C. § 1332 because this action is brought as a class action, diversity of citizenship exists between the parties, and the aggregate amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

5.     Venue in this District is proper pursuant to 28 U.S.C. § 1391 in that Walgreens inhabits, transacts business, resides, is found, and has an agent in this district; and a significant portion of the events giving rise to the claims occurred in this district.

6.     Relief is sought against Walgreens as well as its employees, agents, assistants, and successors.

*Factual Allegations*

7. Walgreens operates thousands of retail stores nationwide. Manufacturers distribute a large variety of products through Walgreens' stores, including nutritional supplements, prescription and over-the-counter drugs, and general merchandise. Manufacturers sometimes participate in Walgreens' promotional programs, including its Register Rewards and Easy Saver rebate programs.

*Walgreens' Register Rewards Program*

8. Under the Register Rewards program, when a Walgreens customer purchases a particular item that is being promoted by the manufacturer, a Catalina coupon machine at the cash register automatically prints a manufacturer-sponsored "Register Rewards" coupon. Catalina coupon machines, which are installed by Catalina Marketing ("Catalina"), are connected to cash registers in Walgreens stores and are operated by Walgreens' cashiers. Catalina coupon machines print coupons at the point of sale that are targeted to customers based on the particular items that customers purchase. For example, using a Catalina machine, a Register Rewards coupon is issued when a particular advertised product is purchased and is redeemable by the customer toward the future purchase of almost any item in the store (with limited exceptions, such as alcohol and tobacco).

9. Walgreens communicates with manufacturers through its proprietary "SupplierNet" website. According to Walgreens, SupplierNet is a primary vehicle for communicating with manufacturers and other vendors:

> SupplierNet site is our main channel of communication with our vendors and contains our company policies, procedures, and supplier performance metrics.[1]

---

[1] See https://webapp.walgreens.com/VendorPortal/JSP/prototypes/index.html.

10. Manufacturers are given a log-in ID and password in order to enter Walgreens' SupplierNet site. Walgreens maintains on this site its Coupon Policy Guidelines, which includes Walgreens' Register Rewards program guidelines. These guidelines are also available on Walgreens' general-public website, which manufacturers can access directly or through SupplierNet.[2] Under its guidelines, Walgreens adheres to certain restrictions on the issuance and redemption of Register Rewards coupons. For example, Register Rewards coupons "will only print for in-stock merchandise during the promotional period," "can only be earned for eligible items," "[t]here is a limit of one Register Rewards™ (RR) printed per offer per customer per transaction," they have a printed expiration date, and the coupons "can be redeemed for eligible items only."

11. Register Rewards promotions typically run weekly or monthly. The manufacturer, which is promoting the product purchased in the initial transaction, agrees to reimburse Walgreens for the face value of each coupon that – in accordance with Walgreens' coupon guidelines – is legitimately issued and redeemed, and to pay certain fees related to the promotion.

12. Rather than adhere to its coupon guidelines, Walgreens uses its Register Rewards program to defraud manufacturers – *e.g.*, by demanding payment for Register Rewards coupons that were never legitimately redeemed by consumers. For example, Walgreens has used Catalina coupon machines to systematically print large volumes of Register Rewards coupons without any corresponding purchase by consumers. It then submits these coupons to manufacturers, represents that the coupons were redeemed by consumers, and then seeks reimbursement from manufacturers for the value of the coupon credits or payments Walgreens claimed to have given consumers.

---

[2] *See* http://www.walgreens.com/topic/generalhelp/coupon_policy_main.jsp.

13.     From January of 2007 through the first half of 2011, Plaintiff Imagenetix sold Celadrin, a nutritional supplement that promotes flexibility and mobility of joints, to Walgreens. In late 2010, Walgreens informed Imagenetix that Walgreens would not continue to stock Celadrin unless Imagenetix participated in the Register Rewards program. From November 2010 through February 2011, Walgreens and Imagenetix (through its broker) discussed Imagenetix's participation in the Register Rewards program. Walgreens indicated that the Register Rewards program would be administered pursuant to Walgreens' coupon guidelines. Prior to agreeing to participate in the Register Rewards program, in or around December 2010, Imagenetix reviewed these guidelines to understand how Walgreens would administer the Register Rewards program. Imagenetix subsequently agreed to participate in the program for a one-week period: from March 20 to March 26, 2011. Under the terms of the promotion to which Walgreens and Imagenetix agreed, consumers would be issued a $10 Register Rewards coupon if they purchased one or more 60-capsule bottles of Celadrin at a purchase price of $10. Each coupon was to expire two weeks after the time of purchase, and could only be redeemed for purchases of eligible items exceeding $10.

14.     Following the week of the promotion, Walgreens represented to Imagenetix that it issued approximately 54,000 Register Rewards coupons related to the purchase of Celadrin and that 52,039 of those coupons were redeemed by customers. The redemption rate of over 95 percent was excessively high, especially considering the relatively short expiration period (*i.e.*, two weeks) for each Register Rewards coupon. Walgreens billed Imagenetix $533,000 for coupons purportedly redeemed, plus $188,000 for scan down charges and a co-op charge related to the Register Rewards program.

15. Because of the extremely high redemption rate for its Register Rewards promotion, Imagenetix audited the program. Imagenetix analyzed the purportedly redeemed coupons that were sent to Imagenetix by Walgreens' coupon processor, NCH Marketing Services, Inc. ("NCH"). Each Register Rewards coupon has a fourteen-digit code with the store number, lane number, and the date and time the coupon was printed. Imagenetix's audit revealed wide-spread fraud by Walgreens.

16. For example, the audit demonstrated that Walgreens manipulated Catalina coupon machines to print Register Rewards coupons in the absence of a purchase of Celadrin. During the promotion week, each Walgreens' store had approximately eight to ten bottles of Celadrin in stock, and the promotion only applied to items in stock during the promotional period. Thus, Walgreens' stores should not have had more than ten Register Rewards coupons issued to consumers. But, as reflected in the chart attached as Exhibit 1, Walgreens claimed that many of its stores issued well over 10 ten coupons that were subsequently redeemed. Specifically, Walgreens claimed that (a) 1,099 stores each issued between 11 and 97 coupons that were subsequently redeemed, (b) six stores issued between 103 and 229 redeemed coupons, and (c) one store issued 1,306 redeemed coupons. Considering that each of these stores would have had ten or fewer bottles of Celadrin in stock during the week-long promotion, Walgreens' claim of how many coupons were legitimately redeemed was false and fraudulent.

17. Walgreens fraud is evidenced not just by the number of coupons Walgreens purported were redeemed in specific stores (as reflected in the chart in Exhibit 1), but also in the manner in which the coupons were issued and redeemed. For example, in many instances, multiple coupons with the same 14-digit coupon number were redeemed, indicating that multiple coupons were issued from the same register in the same store on the same date, and at the same

time, down to the minute. Although only one coupon should have been issued for each purchase that included one or more bottles of Celadrin, one coupon machine generated 38 coupons in a single minute that Walgreens claimed were subsequently redeemed. There were at least 1,824 duplicate coupons – *i.e.*, coupons with the same 14-digit coupon number – purportedly redeemed (a minimum of 3,684 total coupons); at least 397 triplicate coupons purportedly redeemed (a minimum of 1,191 total coupons); and at least 295 quadruplicate or greater coupons purportedly redeemed (a minimum of 1,180 total coupons). Given the impossibility or near impossibility of completing between two and thirty-eight customer purchase transactions within the same minute (particularly for a specialty product in which a store had up to only ten bottles in stock), these numbers indicate that Walgreens fraudulently generated coupons in the absence of the purchase of Celadrin. Moreover, at the store in which 1,306 coupons were purportedly redeemed, a $10 Register Rewards coupon for Celadrin was printed at the same register nearly every minute of the day during the promotion dates for several hours each day. This demonstrates that Walgreens manipulated the Catalina coupon machine to fraudulently and systematically generate coupons in the absence of the purchase of Celadrin.

18. Imagenetix's audit also demonstrated that a number of coupons were collected by Walgreens and sent to NCH in the exact same order in which they were issued. NCH provided the coupons to Imagenetix in bundles based on the order in which they were received and purportedly redeemed. When these bundles were audited, Imagenetix found that many "redeemed" coupons were presented in bundles with numerous consecutively numbered coupons. That is, Walgreens claimed that these coupons were redeemed by consumers in the exact same order in which the coupons were issued. In other words, for this to be true, consumers would have had to: (a) purchase Celadrin and receive a coupon at the store check-out,

7

and (b) return to the same store at a later date to redeem the coupon in the exact same order in which consumers originally purchased the product. This implausible redemption pattern demonstrates that the coupons were not issued to or redeemed by consumers, but were fraudulently generated and redeemed in bulk by Walgreens.

19. Other evidence suggests that the coupons were never in the hands of consumers. For example, coupons issued to, and redeemed by, consumers tend to be creased, wrinkled, have markings, or are otherwise in a condition that reflects normal wear and tear associated with consumers handling and storing the coupons. Coupons that are legitimately issued and redeemed generally do not appear in a pristine (*e.g.*, unwrinkled) state. Imagenetix received from Walgreens in excess of 12,000 coupons that were in pristine condition and appear never to have been issued to consumers. The photograph below shows stacks of exemplary pristine Register Rewards coupons that appear never to have been in consumers' hands:



20. In sum, Walgreens fraudulently printed many thousands of Register Rewards coupons in the absence of the purchase of Celadrin, and Walgreens fraudulently submitted numerous coupons to Imagenetix for reimbursement without the coupons ever being issued to or redeemed by Walgreens' customers. On information and belief, Walgreens' conduct was not

unique to Imagenetix, but affected all manufacturers who participated in the Register Rewards program and other similar programs.

*Walgreens' Easy Saver Rebates Program*

21. The Easy Saver rebates program was a promotional program offered by Walgreens until May 2009. Under the Easy Saver program, Walgreens advertised products with associated rebate opportunities in Walgreens' Easy Saver catalog, which were available in store and on Walgreens' website. Walgreens' Easy Saver rebate program guidelines were listed on Walgreens' web site. Pursuant to these guidelines, Walgreens agreed to only offer a rebate if a customer purchased a specified product, submitted "original receipts" and not copies, and properly filled out and submitted the rebate form. Customers who properly submitted the required rebate form and original receipt were given the choice of receiving a rebate check or a credit on a Walgreens gift card. If customers chose the gift card option, they would receive a 10% bonus.

22. Imagenetix participated in Walgreens' Easy Saver program in September 2007, when Imagenetix offered a rebate of the entire purchase price of a $19.99 bottle of Celadrin. In connection with the September 2007 Celadrin promotion, Walgreens sought reimbursement for 32,057 rebates that were allegedly submitted by consumers with valid receipts and rebate forms, totaling approximately $640,000. This represented a redemption rate of over 90 percent, *i.e.*, that over 90 percent of all purchasers of Celadrin during the rebate period submitted a rebate request, timely and properly complied with all of the requirements of the rebate program, and were paid the rebate. Because of the implausibly high redemption rate, Imagenetix conducted an audit of a random sample of 186 customer rebate requests for which Walgreens purportedly reimbursed consumers, and determined that more than 50 percent (96 out of 186) of the rebate requests were

9

improperly approved by Walgreens despite incomplete or inaccurate rebate submissions, including submissions that failed to include an original receipt or failed to reflect the purchase of Celadrin during the promotional period. Imagenetix shared the results of its audit with Walgreens and questioned whether Walgreens in fact paid consumers for the value of the rebates for which it claimed Imagenetix owed Walgreens.

23. Walgreens claimed that the vast majority of its Easy Saver rebate payments to consumers were purportedly paid in the form of credits to consumers' in-store Easy Saver cards, which work like gift cards. Imagenetix requested documentation that substantiated Walgreens' claims of payments to consumers, but Walgreens was unwilling to provide such documentation. On information and belief, Walgreens charged Imagenetix an amount in excess of the payments received by consumers.

24. As a result of Walgreens' misconduct related to the Register Rewards, Easy Saver, and other programs, Imagenetix and other manufacturers have overpaid Walgreens.

### *Class Action Allegations*

25. Plaintiff brings this action, pursuant to Fed. R. Civ. P. 23, on behalf of a class of:

> Manufacturers that Walgreens charged (or deducted from accounts) credits, discounts, rebates, and/or coupon fees for coupons or rebates that were not legitimately issued to and/or redeemed by consumers from five years prior to the date of the filing of this Complaint through the present, and continuing until the Walgreens' unlawful conduct ceases (the "Class Period").

26. Excluded from the class are the Court and its officers, employees and relatives, Walgreens and its subsidiaries, affiliates, employees and co-conspirators.

27. Members of the class are so numerous and geographically dispersed that joinder is impracticable. While the exact number of class members is unknown to Imagenetix, it is

believed to be in the hundreds or thousands. Members of the class are readily identifiable from information and records in possession of Walgreens.

28. Questions of law and fact common to members of the class predominate over questions, if any, that may affect only individual class members because Walgreens has acted on grounds generally applicable to the class. Such generally applicable conduct is inherent in Walgreens' wrongful conduct. Common questions of law or fact include, but are not limited to:

    a. Whether Walgreens' claims for payment constitutes fraud where Walgreens falsely represents to manufacturers that its claims are based on properly issued and redeemed coupons or rebates;

    b. Whether Walgreens breached agreements with Imagenetix and other class members by improperly issuing and redeeming coupons;

    c. Whether Walgreens was unjustly enriched by its demands for payment from Imagenetix and other class members for coupons that were never redeemed by customers;

    d. Whether Imagenetix and other class members have sustained or continue to sustain damages as a result of Walgreens' wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages;

    e. Whether Imagenetix and other class members are entitled to an award of compensatory, and/or punitive damages, and, if so, in what amount; and

    f. Whether Imagenetix and other class members are entitled to injunctive or other equitable relief.

29. Imagenetix's claims are typical of the claims of the members of the class. Imagenetix and all members of the class were damaged by the same wrongful conduct by the Defendants, *e.g.*, they all have been charged by Walgreens as a result of its fraudulent and wrongful conduct.

30. Imagenetix will fairly and adequately protect the interests of other class members because it has no interest that is antagonistic to or which conflicts with those of any other class member, and Imagenetix is committed to the vigorous prosecution of this action and has retained

competent counsel experienced in litigation of this nature to represent Imagenetix and other members of the class.

31. The prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual members of the class, which could establish incompatible standards of conduct for Walgreens.

32. This class action is the superior method for the fair and efficient adjudication of this controversy. Class treatment will permit a large number of similarly-situated individuals to prosecute their claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would produce.

33. This case will be eminently manageable as a class action. Imagenetix knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

## COUNT I – FRAUD (ILLINOIS LAW)

34. Imagenetix incorporates paragraphs 1 – 33 by reference as if fully set forth herein.

35. Walgreens knowingly made false statements of material fact to Imagenetix and other class members about the conditions under which, and whether, promotional discounts or rebates were extended to Walgreens' customers, as described above. For example, through the coupon guidelines communicated to manufacturers on Walgreens' website, Walgreens continuously made false representations to Imagenetix and the class about the terms and conditions of Walgreens' promotional programs. Further, Walgreens falsely represented that it would administer its promotional programs consistent with its coupon guidelines. Moreover,

Walgreens falsely represented that promotional discounts or rebates were only given to customers.

36. In justifiable reliance on these false representations, Imagenetix and other manufacturers paid Walgreens (or Walgreens made deductions from the amount Walgreens owed manufacturers for the purchase of products) for the value of promotional discounts or rebates that were not given to Walgreens' customers (plus related fees), causing injury to Imagenetix and the class in excess of $5 million.

## COUNT II – BREACH OF CONTRACT (ILLINOIS LAW)

37. Imagentix incorporates paragraphs 1 – 36 by reference as if fully set forth herein.

38. Walgreens entered into valid, binding, and enforceable agreements with Imagenetix and other class members to participate in Walgreens' promotional programs, including the Register Rewards and Easy Saver rebate programs, as described above.

39. Walgreens breached its agreements with Imagenetix and other class members, as described above. For example, contrary to Walgreens' agreements, Walgreens charged Imagenetix and other class members for promotional discounts or rebates that Walgreens never extended to its customers (plus related fees).

40. Walgreens' breach of contract directly and proximately caused damages to Imagenetix and other class members in excess of $5 million.

## COUNT III – UNJUST ENRICHMENT (ILLINOIS LAW)

41. Imagenetix incorporates paragraphs 1 – 40 by reference as if fully set forth herein.

42. Walgreens was unjustly enriched by the conduct described above, causing harm to Imagenetix and other manufacturers without justification.

43. Imagenetix and the class plead unjust enrichment in the alternative to their other causes of action, and in the alternative, Imagenetix and the class lack a remedy at law.

44. Imagenetix and the class seek damages in excess of $5 million.

## JURY TRIAL DEMAND

45. Pursuant to Fed. R. Civ. P. 38(b), Imagenetix, on its own behalf and on behalf of the class, demand a trial by jury of all claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Imagenetix requests entry of judgment against Walgreens:

a. Certifying that this action may be maintained as a class action under Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, appointing Imagenetix as class representative and its counsel as lead class counsel;

b. Directing that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure be given to members of the Class;

c. Awarding Imagenetix and the Class their full monetary damages to be proven at trial;

d. Awarding Imagenetix and the Class punitive damages, interest, and all civil remedies available under Illinois statutory law and common law;

e. Awarding Imagenetix and the Class pre-and post-judgment interest on their damages;

f. Awarding Imagenetix and the Class the costs of this action and reasonable attorneys' fees pursuant to Illinois statutory law and common law;

g. Enjoining Walgreens from continuing or resuming its unlawful and fraudulent practices;

      h.      Awarding all appropriate legal or equitable relief; and

      i.      Awarding Imagenetix and the Class such other and further relief as the Court deems just and proper.

Dated this 18 day of November 2011.

                      Respectfully submitted,

                      By: _/s/ Daryl M. Schumacher_____
                            One of Plaintiff's Attorneys

Daryl M. Schumacher
Brooke E Conner
Kopecky, Schumacher & Bleakley, P.C.
203 North LaSalle Street Suite 1620
Chicago, IL 60601
(312) 380-6556
dschumacher@ksblegal.com
bconner@ksblegal.com


Daniel A. Kotchen
Daniel L. Low
Robert Klinck
Alicia Gutierrez
Justin Ervin
Kotchen & Low LLP
2300 M Street, NW
Suite 800
Washington, D.C. 20037
(202) 416-1848
(202) 280-1128 (fax)
dkotchen@kotchen.com
dlow@kotchen.com
rklinck@kotchen.com
agutierrez@kotchen.com
jervin@kotchen.com